IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MICHAEL BERRYMAN,**

        **Plaintiff,**

v.                                                            Civil Action No. 1:16cv63
                                                              (Judge Keeley)

**UNITED STATES OF AMERICA,**

        **Defendant.**

## REPORT AND RECOMMENDATION

On April 14, 2016, the *pro se* Plaintiff, an inmate then-incarcerated at FCI Fairton in Fairton, New Jersey,[1] initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671, et seq. The Plaintiff was granted permission to proceed as a pauper on July 20, 2016, and paid his initial partial filing fee on August 15, 2016. ECF Nos. 19 & 26.

On October 3, 2016, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Accordingly, the Clerk was directed to issue summonses and forward copies of the complaint to the United States Marshal Service for service of process. ECF No. 30. The Government moved for an extension of time in which to answer the complaint on December 1, 2016; the motion was granted by Order entered the following day. ECF Nos. 38 & 39.

On December 19, 2016, the Defendant filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment along with a memorandum in support, attaching certain documents. ECF Nos. 41 & 42. A Roseboro Notice issued on December 20, 2016. ECF No. 43.

---

[1] Plaintiff is presently incarcerated at FCI Butner Medium, in Butner, North Carolina.

1

Plaintiff moved for an enlargement of time on January 12, 2017; the motion was granted by Order entered January 24, 2017.  ECF Nos. 47 & 48.  On January 25, 2017, Plaintiff moved the court for an order directing the Defendant to obtain an examination for Plaintiff with an outside doctor.  ECF No. 49.  On February 17, 2017, Plaintiff filed a *pro se* motion to deny Defendant's motion to dismiss or for summary judgment and for a time enlargement.  ECF No. 51. By Order entered March 1, 2017, Plaintiff's second motion for an extension of time was granted. ECF No. 52.  On April 6, 2017, Plaintiff filed a motion for the dismissal of the defendant's motion for summary judgment and/or dismissal; a motion for discovery; and a Declaration. ECF Nos. 54, 55 & 56. By Order entered April 24, 2017, Plaintiff's motion for discovery was denied without prejudice as premature. ECF No. 57.

This case is before the undersigned for review, Report and Recommendation pursuant to LR PL P 2.

## I. Factual Background

On December 11, 2012, Plaintiff was sentenced in United States District Court for the District of New Mexico to an eight-year term of imprisonment on a weapon charge.  He is scheduled for release on December 6, 2018 via Good Conduct Time Release. Declaration of Howard Williams, Legal Assistant/Administrative Remedy Clerk, Mid-Atlantic Regional Office of BOP, ("Howard Williams Decl."), ECF No. 42-1, ¶ 3 at 2 and Public Information Inmate Data, Id. at 6.

In May, 2014, Plaintiff was serving his sentence at USP Hazelton, in Bruceton Mills, West Virginia.  Howard Williams Decl., Id., ¶ 4 at 2. On Thursday, May 8, 2014, at around 3:32am, the USP Hazelton Special Housing Unit ("SHU") Control Center Officer announced a fight in the SHU; when officers responded, SHU staff notified them that the fight was in Range

6, cell 241. Declaration of Alex Harrison ("Alex Harrison Decl."), ECF No. 42-6, ¶ 2 at 2. Upon arrival, officers witnessed inmate V.A. striking Plaintiff in the head and upper torso as Plaintiff lay on the floor. ECF No. 42 at 2; but see Alex Harrison Decl. ECF No. 42-6, ¶ 3 at 2 ("when I arrived, I witnessed inmate . . . [V.A.] kicking Plaintiff while he was lying on the cell floor"). Both inmates were directed to submit to hand restraints and both complied. Alex Harrison Decl. ECF No. 42-6, ¶ 3 at 2. Defendant avers that at an unspecified time after the altercation, both inmates were medically assessed, photographed, and the Captain and Duty Officer were notified as per Bureau of Prisons ("BOP") protocol. Id., ¶ 4. Plaintiff was seen by Physician's Assistant Christopher Meyer ("P.A. Meyer") at around 5:33 a.m. Declaration of Christopher Meyer ("Meyer Decl."), ECF No. 42-7, ¶ 4 at 2. However, Plaintiff refused to cooperate with P.A. Meyer's examination and refused a direct examination, wound care and dressings. Id. Thus, Meyer could not fully assess Plaintiff's injuries, but he did make certain observations: Plaintiff's injuries were minor and included a superficial abrasion to his right eyebrow, with a 1 – 2 cm contusion to the right and left forehead and superficial abrasions of both knees. Id. Meyer's Declaration avers that he documented these injuries in Plaintiff's medical records. Id. Defendant avers that Meyer noted that Plaintiff appeared oriented, well, and not in distress, and that Meyers "treated the superficial wounds he observed on Plaintiff, though Plaintiff refused full dressing and wound care, and instructed Plaintiff to follow up at sick call as needed[] . . . [and] noted in Plaintiff's medical records that Plaintiff was seen for a temporary or acute new condition." ECF No. 42 at 11. Meyer's declaration makes no mention of these facts; it is unknown whether Defendant is quoting from Plaintiff's medical records, which were not produced. Meyers further averred that he had reviewed Plaintiff's medical records, which indicate that Plaintiff was seen again on May 15, 2014 by a USP Hazelton Registered Nurse referred to in Plaintiff's complaint

3

as "Frind." Id., ¶ 5 at 2. Plaintiff advised Nurse "Frind" that he was on a hunger strike and complained of pain in his center posterior neck and the center of his back. ECF No. 42-7 at 2. Nurse "Frind" noted that there was no redness or tenderness to the touch when examined, but that Plaintiff had some yellowed bruising on his right forearm, left wrist, and thumb area [id.]; there are no notations of broken bones in Plaintiff's medical record from this encounter. Id. at 2 – 3. Nurse "Frind" consulted the Clinical Director about Plaintiff's case. Id. at 3. The Clinical Director reviewed the medical record, and determined that based on Plaintiff's complaints, injuries, and examinations, x-rays were not indicated. ECF No. 42 at 3. Meyer's sworn Declaration further stated that "Plaintiff received proper care on numerous occasions following the May 2014 incident." ECF No. 42-7 at 3.

## II. The Pleadings

### A. The Complaint

Plaintiff's claims have been reordered to clarify them and render them more concise.

Plaintiff raises due process and Eighth Amendment violations, alleging that while he was incarcerated at USP Hazelton on May 8, 2014, the Defendant failed to protect him from attack from an inmate with a known history of attacking cell mates after he repeatedly begged to be moved and advised BOP staff that his cell mate was threatening him. ECF No. 1 at 11 - 14.

Plaintiff avers that he awoke in the early morning hours to his roommate repeatedly "stomping" his left ribcage. Id. at 14. After the attack, Plaintiff alleges the Defendant was deliberately indifferent to his medical needs and committed medical malpractice by denying him adequate medical care "in an attempt [sic] to cover up what happen[ed]" [id. at 16] and/or blocking him from receiving medical attention from any other medical provider at USP Hazelton. Id. at 17. Plaintiff claims he was so injured and in so much pain that he was unable to

4

get up to take medications, eat, drink or use the bathroom. Id. at 15. Specifically, he contends that Physician Assistant Meyer ("P.A. Meyer") observed his injuries but failed to document them and then lied about him refusing medical attention, "to cover up my injuries because of the way I received them." Id. at 16. He asserts that P.A. Meyer "refused me medical for over five months." Id.

Further, Plaintiff contends that his Eighth Amendment and procedural due process rights were violated when the Defendant confiscated all his personal belongings, including his legal papers, and confined him in punitive segregation for 11 days after the attack, leaving him with only paper clothing and bedding and no hygiene products. Id. at 10 and 13 – 16.

Plaintiff avers that he sustained "[l]eft rib fractures and disk herniation" in the attack. Id. at 18.[2] He attaches copies of several radiological imaging reports to his complaint. Id. at 19 – 23.

The Plaintiff maintains that he filed an Administrative Tort Claim with the BOP for his federal tort claims and attached copies. Id. at 4 – 9.

As relief, he requests One Million Dollars ($1,000,000.00) in compensatory damages; attorney's fees and costs, and payment of all medical expenses. Id. at 18.

**B. The Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment**

The Defendant contends that the complaint should be dismissed or summary judgment granted in its favor because

1) Plaintiff's FTCA medical negligence and/or medical malpractice claims should be dismissed because they have no merit; further, Plaintiff did not comply with the threshold statutory requirements of the West Virginia Medical Professional Liability

---

[2] In Plaintiff's Bivens action, Case No. 1:16cv47, filed over the same facts as alleged in this complaint, he asserted that the injuries he sustained from the attack were 4 protruding disks in his lower lumbar back area with severe stenosis; lower lumbar thecal sac encroachments; a lumbar slipped disk; cervical spine stenosis from C6-C7; disk herniation moderately encroaching upon the thecal sac at the C3-4 level; "hard disks/osteophyt [sic] complex thecal sac encroaching" C6-7; and evidence of remote rib fractures with rib deformity in the lower left ribs. Case No. 1:16cv47, ECF No. 1 at 17.

5

        Act ("MPLA"), by asserting the pertinent standard of care and filing a screening certificate of merit as required by the MPLA [ECF No. 42 at 6 and 11 - 12];

2) Plaintiff's other FTCA claims should be dismissed because the Defendant was not negligent and Plaintiff provides no evidence to support his claim that multiple officers failed to protect him after he informed them that he was in danger of being attacked by his cell mate. Id. at 9.

3) Plaintiff has provided no evidence to support his claim that he was placed in a cell in alternative clothing without basic necessities and his claim in this regard fails to state a claim of negligence. Id. at 10 – 11.

## C. Plaintiff's Response in Opposition

In response, Plaintiff moves for dismissal of the Defendant's dispositive motion and contends that he cannot adequately oppose it unless he is permitted to engage in discovery, because the BOP employees stole or destroyed all or most of his records and documents pertaining to this case in retaliation for his filing it. ECF No. 54 at 1 – 2. He lists the names of two of three inmates he avers provided written statements on his behalf, stating that he is sure that they will re-write their statements. Id. at 2. Further, he provides a sworn Declaration, reiterating his claims and attempting to refute the Defendant's arguments on the same, contending that the individual BOP employees who submitted declarations lied in them. ECF No. 56 at 1 – 7.

## III. Standard of Review

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs., 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and

nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8 (providing general rules of pleading), Fed. R. Civ. P. 9 (providing rules for pleading special matters), Fed. R. Civ. P. 10 (specifying pleading form), Fed. R. Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed. R. Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se*

pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520 - 21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

**B. Motion for Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S.

317, 322 - 23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that "the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## IV. Analysis

A. Federal Tort Claims

1) Due Process and Eighth Amendment Rights Violations Arising out of Intentional Acts

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in

Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680. Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 & 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to a plaintiff alleged to have been inflicted by the negligence of the defendant, a plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on plaintiff to prove these elements by a preponderance of the evidence. Id. at 899; see also Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004)(stating that "no action for negligence will lie without a duty broken.").

The FTCA includes specific enumerated exceptions in 28 U.S.C. § 2680. If an exception applies, the United States may not be sued and litigation based upon an exempt claim is at an end. Smith v. United States, 507 U.S. 197 (1993); Dalehite, *supra*. Among the exceptions to the FTCA most frequently applied is the "discretionary function." The discretionary function exception precludes governmental liability for "[a]ny claim based upon ... the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary

between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Congress believed that imposing liability on the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Id. at 814 (internal citations and quotations omitted).

The United States Supreme Court has announced a two-step test for determining whether the discretionary function exception bars suit against the United States in a given case. First, the Court must consider the nature of the conduct and determine whether it involves "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991). Government conduct does not involve an element of judgment or choice and is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Id. at 322 (internal citations and quotations omitted). If the conduct in question involves the exercise of judgment or choice, the second step of the analysis is to determine whether that judgment is grounded in considerations of public policy. "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 323.

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. § 4042, independent of an inconsistent state rule. United States v. Munitz, 280 F. Supp. 542, 546 (S.D.N.Y 1968). Title 18 U.S.C. § 4042 defines the duty of care owed to a prisoner as "the exercise of ordinary diligence to keep prisoners safe and free from harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). However, the BOP's duty

towards the protection of prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place, manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia law is consistent with 18 U.S.C. § 4042.

Although 18 U.S.C. § 4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)(finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008).

As previously noted, Plaintiff alleges that on or about May 8, 2014, while housed at USP Hazelton, he was attacked by inmate V.A. Plaintiff further alleges that he had repeatedly warned the BOP staff that V.A. had threatened to hurt or kill him if he did not get himself moved out of their common cell, and that V.A. had a history of attacking cell mates. Plaintiff does not allege that he had a separation order in place, segregating V.A. from him. Nonetheless, based on the multiple warnings Plaintiff contends he gave BOP staff in early May, 2014, leading up to the

early morning hours of May 8, 2014, all individual BOP staff members on his unit were duly informed of the risk that V.A. posed to him, and that they were aware that V.A. was a real and substantial threat to his safety. Plaintiff alleges that despite this knowledge, the BOP employees deliberately left him in the same cell with V.A., which resulted in the incident on May 8, 2014. Based on these willful acts and alleged indifference to his safety, in violation of his Eighth Amendment rights, Plaintiff seeks compensation from the United States.

The record before this Court does not support Plaintiff's allegations. Each of the individual BOP employees who were involved have all submitted sworn Declarations on the point. The Declarations of Jerald Riffle, Christopher Mullen, John Brady, and Brad Brown all deny that Plaintiff ever conveyed any fear of attack by V.A. to them, prior to the May 8, 2014 incident; all aver that there was no separation order in place between the two inmates; and all aver that if Plaintiff had conveyed his fear of attack to them, they would have referred Plaintiff to either the Lieutenant on duty or to Psychological Services and the Special Investigative Supervisor ("SIS"); because allegations of this type are taken very seriously at USP Hazelton. See ECF No. 42-2 at 2; ECF No. 42-3 at 2 – 3; ECF No. 42-4 at 2 – 3; and ECF No. 42-5 at 2.

Here, however, the Plaintiff has not alleged that the Defendant's BOP employees were negligent.  Instead, he implicitly asserts that the Defendant's acts in failing to protect him from assault; in confiscating of his personal property and leaving him in paper clothing for 11 days afterwards without his belongings and hygiene items; and their acts of deliberate indifference to his allegedly serious medical needs for five months after the attack were willful and knowing violations of his constitutional rights. None of these claims state any cause of action with respect to any negligent acts on the part of the Defendant or its employees.  Thus, these tort claims fail

and must be dismissed. See FDIC v. Meyer, 114 S.Ct. 996 (1994) (constitutional torts are not cognizable under the FTCA).

**2) Medical Malpractice**

To establish a medical negligence claim in West Virginia, the plaintiff must prove that: (a) the health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death. W.Va. Code §55-7B-3. When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated, and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hosp. for Rehabilitation, 529 S.E.2d 600, 605 - 06, 207 W. Va. 135, 140 - 41 (W. Va. Apr. 24, 2000)

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) *At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim* on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, *together with a screening certificate of merit*. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard

>of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

W.Va. Code § 55-7B-6 (emphasis added).

This Court previously held that compliance with W.Va. Code § 55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004). In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

Here, the Plaintiff alleges that P.A. Meyer, as the "acting P.A. for the SHU" where he was housed, refused him medical attention and blocked him from receiving medical care from any other P.A. or doctor. ECF No. 1 at 17. Thus, he impliedly contends that P.A. Meyer was negligent in his care, because Meyer failed to provide adequate medical care after the May 8, 2014 attack and ignored his repeated requests for medical attention while he was in USP Hazelton's SHU for five months after the attack, despite his repeated requests for treatment.

Here, with regard to the appropriate standard of care, Plaintiff has completely failed to sustain his burden of proof. Plaintiff does not even assert, much less establish, what the standard of care for the diagnosis or treatment of left rib fractures and/or herniated disks would be. Plaintiff offers no pleadings, affidavits, or declarations from any medical professional that establishes the applicable community standards for the diagnosis or treatment of these alleged injuries, and copies of Plaintiff's medical records are insufficient to establish the standard of care.

Under the circumstances of this case, Plaintiff would be required to produce the medical opinion of a qualified health care provider in order to raise any genuine issue of material fact with respect to the Defendant's breach of the duty of care. Further, a careful review of the copies of radiological imaging studies Plaintiff attached to his complaint and his motion for a referral to an outside medical provider, reveals that Plaintiff's sole claim in the complaint, that his cell mate "stomped" his left rib cage, does not comport with the evidence of chronic pre-existing arthritic changes to many areas of the body found in the imaging studies, in areas where Plaintiff did not allege his cell mate struck him, but now claims were injured during that attack. Those imaging records include: a partial copy of a January 6, 2015 CT of the chest, abdomen and pelvis without IV contrast [ECF No. 1 at 19]; a partial copy of a March 27, 2015 CT of the cervical spine without contrast [ECF No. 1 at 20]; a copy of a June 7, 2015 MRI of the lumbar spine [ECF No. 1 at 21 – 23]; a partial copy of a May 25, 2016 MRI of the cervical spine without contrast [ECF No. 49-1 at 1]; and a partial copy of a May 25, 2016 MRI of the lumbar spine without contrast. ECF No. 49-1 at 4.

The January 6, 2015 CT of the chest, abdomen and pelvis, performed because of a history of "sclerotic bone lesions" approximately 8 months after the May 8, 2014 assault notes as an incidental finding "[e]vidence of remote rib fractures and rib deformity lower anterior left chest. No acute rib fractures." ECF No. 1 at 19. As noted in the Report and Recommendation in Plaintiff's Bivens action on these same claims, "remote" is an inexact description; it merely means that the fractures were not "acute" or fresh. Given that rib fractures typically take one to two months to heal, if indeed these healed fractures were a result of the May 8, 2014 attack, any rib fracture sustained at that time would be expected to have long since healed. Nonetheless, fractured ribs in the lower anterior left chest do not comport with the pain Plaintiff apparently

16

reported to Nurse "Frind" one week after the attack; on that date, Plaintiff complained of pain in his center posterior neck and the center of his back; neither area, when pressed, was tender to touch. Had Plaintiff had fractured ribs from the attack, he would have been acutely uncomfortable if the area was subjected to pressure; moreover, he would have had difficulty breathing because of the pain. He has alleged neither. Accordingly, it seems likely that the rib fractures seen on the January 6, 2015 CT of the chest, abdomen and pelvis were more "remote" than eight months old, and were likely a pre-existing injury.

The March 27, 2015 CT of the cervical spine, performed approximately ten months and two and a half weeks after the May 8, 2014 altercation, shows moderate cervical degenerative joint disease; no acute bony abnormality; and possible thecal sac encroachment at C3-C4. See ECF No. 1 at 20. Not only are these degenerative changes, nowhere has Plaintiff ever alleged that he was struck in the neck.

The MRI of the lumbar spine, performed on June 7, 2015, approximately 11 months after the May, 2014 assault, performed for complaints of low back pain, does show straightening of the normal lumbar lordosis; mild convex left lumbar scoliosis; congenitally short pedicles causing diffuse baseline central spinal stenosis; minimal central spinal stenosis at L2-L3; mid-central spinal stenosis at L3-L4; small central disc protrusion, severe spinal stenosis, moderate bilateral lateral recess stenosis; moderate bilateral neural foraminal narrowing at L4-L5; numerous traversing nerve roots are potentially compressed, and a small right paracentral disc protrusion at L5-S1 contacts the traversing right S1 nerve roots; prominent epidural fat at the same level completely effaces the thecal sac. See ECF No. 49-1 at 6. However, not only do the detailed findings of this exam document multiple signs of chronic arthritic changes which take many years to develop, as opposed to acute injuries, the reference to "congenitally short

pedicles" indicates that the root cause of Plaintiff's "diffuse baseline central spinal stenosis" is something he was born with, nowhere in his complaint does Plaintiff ever allege that his cell mate inflicted any injury to his lumbar spine (lower back) when he "stomped" his left rib cage.

The May 25, 2016 MRI of the cervical spine, performed two years and 2+ weeks after the May, 2014 altercation, shows no apparent masses, tonsillar herniation or narrowing of the foramen magnum at the craniocervical junction (junction between head and neck); no evidence of subluxation of the vertebral column; some "chronic-appearing invagination involving the superior endplate C7 vertebral body, but the radiologist noted that "[t]his area is not associated with bone marrow edema to suggest acute compression fracture deformity." The exam also revealed that Plaintiff's cervical spinal cord at the C2-C3 level had no evidence of disc herniation, central spinal stenosis or significant foraminal stenosis. At the C3-C4 level, there was moderate central disc osteophyte, resulting in ventral compression of the thecal sac ad abutting the adjacent cervical spinal cord, with mild flattening, causing mild narrowing of the anterior/posterior dimensions of the cervical spinal canal, and facet joint degenerative changes resulting in mild narrowing of the left foramen. At the C4-C5 level, there was a mild bulging disc without evidence of disc herniation or central spinal stenosis, but some mild-moderate narrowing of the left foramen, due to degenerative changes. See ECF No. 49-1 at 2. Not only are osteophytes and degenerative changes of the spinal cord a result of years of accumulated osteoarthritis, a part of the normal aging process, nowhere in his complaint does Plaintiff ever allege he was injured in the neck (cervical spine), when his cell mate "stomped" his left rib cage.

The May 25, 2016 MRI of the lumbar spine, also performed two years and 2+ weeks after the May, 2014 altercation, shows no enlargement, masses or signal abnormality in Plaintiff's conus medullaris; no evidence of compression fracture deformity or subluxation in the vertebral

column; no evidence of disc herniation at L1-L2; age-related degenerative changes of the disc manifested by dessication of disc material at the L2-L3 level without evidence of disc herniation, central spinal stenosis or significant foraminal stenosis, and some mild facet joint degenerative changes; and a mild bulging disc at the L3-L4 level with mild narrowing involving the inferior aspect of the neural foramen, but with no evidence of encroachment on the nerves exiting from that location, and mild facet joint degenerative changes with no evidence of significant central spinal stenosis. See ECF No. 49-1 at 4. Again, the changes seen appear to be age-related osteoarthritic changes of the lumber spine (lower back), an area where Plaintiff has not alleged his cell mate struck him.

Nonetheless, even if any of the conditions noted in his imaging studies were related to the May 8, 2014 incident, to the extent Plaintiff's medical negligence claims arise in West Virginia, there is nothing in the complaint which reveals that the Plaintiff has met the requirements of W.Va. Code §55-7B-6. Thus, upon consideration that Plaintiff's allegations involve complex orthopedic and neurological conditions, the Court finds that a screening certificate of merit is required. Plaintiff has not obtained one, and the time for doing so has long passed. Consequently, the United States' motion to dismiss or grant summary judgment in its favor should be granted.

## V. Recommendation

Therefore, for the reasons set forth above, it is recommended that the Defendant's Motion to Dismiss or in the Alternative, for Summary Judgment [ECF No. 41] be **GRANTED** and Plaintiff's complaint [ECF No. 1] be **DISMISSED with prejudice for failure to state a claim upon which relief can be granted.**

Further, the undersigned recommends that Plaintiff's pending *pro se* motion requesting that the court order the Defendant to obtain an examination for Plaintiff by an outside doctor

[ECF No. 49] and Plaintiff's *pro se* motion for dismissal of the Defendant's motion for summary judgment and/or dismissal [ECF No. 54] both be **DENIED as moot**.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

DATED: July 5, 2017

                                                /s/ James E. Seibert
                                                JAMES E. SEIBERT
                                                UNITED STATES MAGISTRATE JUDGE